Mr. Jones, good morning, Your Honors. May it please the Court, my name is Patrick Jones and I represent the plaintiff appellants in this case, Northbound Group, Inc. The appellant would like to reserve three minutes for rebuttal. All right. This is a simple breach of contract case that arose out of the defendant's failed performance under an asset purchase agreement whereby Defendant Norvax, Inc. acquired the assets related to the lead bot brand from McAleer spent 12 years of their lives developing the lead bot business into the top site, top business for internet generated life insurance leads. In 2008, the appellant's bank suddenly cut off its line of credit, causing a cash crunch that prevented the appellant from fulfilling the orders of its growing number of customers. Around that same time, it entered into negotiations with Norvax pursuing the sale of the lead bot assets. Norvax negotiated all the terms of the APA. Norvax paid for the lead bot assets and Norvax employed McAleer and Wagner. In association with the transaction, Norvax created a shell, lead bot LLC. Norvax was the sole member of lead bot LLC. Lead bot LLC never filed separate tax returns, never had its own bank accounts, didn't have any employees. Now Northbound was aware that lead bot LLC and Norvax were distinct corporate entities, even though I understand you're saying what was included in it, but they were aware of that. Yes, that's correct. They were aware. In 2009, Norvax acquired the lead bot assets pursuant to the APA. Article 2I of the APA required Norvax to use those assets in furtherance of the lead bot brand. What they acquired at the transaction was over 6,000 open orders for the purchase of life insurance leads, 11 lead supply agreements from third parties who would supply leads that could then be sold to lead bot customers, a top ranking on Google search. If you searched life insurance leads back at that time, the number one site that would pop up would be lead bot, and 18 internet domains that could all be used to generate new life insurance leads. It's the plaintiff's contention that Norvax failed to make good faith efforts to use those assets in furtherance of the lead bot brand. On appeal, there's four issues that are presented to the court. The first is whether the district court properly granted summary judgment in favor of Norvax and lead bot LLC with respect to account three, the breach of contract claim. Within that issue, there's two separate issues. The first is whether the court ruled correctly as a matter of law that a party, a non-party to a contract cannot be held liable for breach of that contract. The second sub-issue is whether the district court properly resolved the issue of Norvax's good faith performance under the APA at the summary judgment stage. Norvax or lead bot LLCs? Norvax. So you're not interested in a judgment against lead bot LLC? No, it has no assets, no employees. One of the issues, Your Honor, that you highlight is that the court, district court, in its decision on the motion for summary judgment was critical of the plaintiffs for focusing on the conduct of Norvax Inc. and not lead bot LLC. The obvious reason is that there was no conduct of lead bot LLC. This purchase agreement is made effective as of this date by and between lead bot LLC, a Delaware limited liability company, and Northbound Group Inc., an Arizona corporation? I mean, you guys walked into this wide open? Wide open, right? No, Your Honor, we didn't. The transaction itself, yes, normally occurred between lead bot LLC, but the evidence showed that was developed during the course of discovery that, again, lead bot LLC didn't do anything. Norvax assumed all the obligations and all the benefits of the asset purchase agreement. And did you know that before the contract was signed? I don't believe that was known, Your Honor. But I don't believe the record's clear on that point specifically. There's presumably nothing remotely surprising about that, right? The corporation sets up a subsidiary, whether it's an incorporation or an LLC, to shield this, and it is a limited liability corporation, right? Right. Yes, Your Honor. Now the surprising thing is that lead bot LLC didn't pay the purchase price. Norvax did. The surprising thing is that lead bot LLC didn't employ MacLear and Wagner. Norvax Inc. did. I think if you enter into a transaction with a legal entity, you assume that that's the legal entity that you're going to be dealing with. That circuit has recognized that. So your client knew nothing about how this thing was going to operate and when they signed this agreement? I believe they had a general understanding, but they thought that the operations would trickle through lead bot LLC, not that they would be dealing directly on all matters with Norvax Inc. Initially, the employment agreements were actually drafted for Norvax Inc. then paid their salaries and their benefits, and when they were terminated, that termination agreement was between MacLear, Wagner, and Norvax, not lead bot LLC. Seventh Circuit has recognized that non-parties to a contract may be held liable for breach of that contract if they are either in privity to the contract or if they are third-party beneficiaries. The court, Seventh Circuit, and the lower court recognized it in their opinion on the motion to dismiss. There was no alter ego argument alleged in the complaint, was there? No, there wasn't, Your Honor, and that was one of the major problems that was set in motion by the court's decision on the motion to dismiss. At the motion to dismiss stage, the court ruled that Northbound could hold Norvax liable for breach of the contract. The facts demonstrated that Norvax was the sole member of lead bot LLC and Norvax purchased the lead bot assets. The district court held if the plaintiff can prove those two things, then it can hold Norvax directly liable for breach of the contract. Therefore, there was no reason at that point to amend the complaint and allege an alter ego theory. Had the court held at the motion to dismiss stage that only a contract can be held liable for that contract, that is a rule with no exceptions, then yes, Your Honor, we would have amended the complaint to add an alter ego theory. So the evidence that was developed during discovery proved unequivocally that Norvax was the sole member of lead bot LLC and that Norvax, in fact, paid the purchase price for the lead bot assets. According to the lower court's ruling on the motions to dismiss, the plaintiff had done everything it needed to do to make, to hold Norvax, Inc. liable for the breach of the contract. So your theory is that Norvax was in privity with lead bot? Yes, Your Honor. That's correct. Not that it was a third party beneficiary? Right. That it was in privity with the contract, not that it was a third party beneficiary. With the contract, not just with the other party to the contract. Well, I'm sorry, I misspoke, Your Honor. With lead bot LLC, the other party to the contract, and the contract itself. No, no, no. There's a huge difference there, right? Right. If it's just in privity with the other party to the contract, then you can pierce corporate veils without limit. That would turn commercial law upside down. Right. So what is it you think you have to show? I'm sorry, Your Honor, I misspoke. It isn't that Norvax, Inc. was in privity with the contract itself. Okay, and what does that mean to you? That means that Norvax, Inc. assumed by its conduct all of the responsibilities and obligations under the contract. Nonetheless, despite the fact that Northbound did exactly what the district court instructed it to do, the legal standard changed at the summary judgment stage. At the summary judgment stage, the district court reversed itself and now held that a non-party to a contract can never be held liable for breach of that contract. That's not the law of this circuit, and that's not the law of the case. At the very least, if that is going to be the rule set forth in this case, and if this court agrees that that's the proper legal standard in the Seventh Circuit, the plaintiff had to have been on notice and had a right to be on notice that that was going to be the new standard, the new legal standard applied at the summary judgment stage. As the Seventh Circuit stated in Nosler v. Ford, a party is entitled to notice that its case is going to be dismissed on a certain point before the act actually falls. In this case, the plaintiff had no notice that the court was going to reverse itself and that, as you stated, Your Honor, an alter ego theory would have been preferable. And was there a motion filed to reconsider? Yes, there was, Your Honor. And that was denied as well? That was denied. I couldn't remember, but there was no opinion? No, I don't believe there was. Mr. Jones, could I ask you about the motion to strike some of your evidence? Yes. I'm particularly interested in the discussion regarding the so-called bid platform issue and the affidavits about that. If you had had an opportunity to respond to that motion to strike, what would you have said to explain the differences between the deposition testimony and the affidavits? I would have responded, Your Honor, that Mr. McAleer's testimony didn't contradict anything that was in the affidavit. Well, there's a problem. The issue here, the first level of the problem is how specific the deposition questions were. The deposition questions, at least that I saw back in the motion to strike, were pretty broad. Both the witnesses were given plenty of opportunities where this information would seemingly have been responsive to the question. So, why not go ahead and grant the motion to strike? Your Honor, I believe it's the movement's responsibility to elicit specific testimony. If they're not going to pin down the deposition witness... Well, they kept asking anything more, you know, have you told us everything, do you remember anything else, and they kept saying no. Right. Right, and not remembering a fact doesn't contradict that fact later. Mr. McAleer testified that what he was working with was a damages calculation spreadsheet. Damages is a whole different problem, okay, but we'll talk about that if you want in a minute. Right, no, I'm speaking specifically to your point though, Your Honor. So what he was being asked questions about was within each cell on that spreadsheet, what were the figures that went in to those calculations? And at the time, he testified that he couldn't remember, that he needed to review his narrative, that he essentially needed to go behind the paper form that he had printed out, he needed to go into the software and look behind those numbers to see how he reached that calculation. That's what he did later, and that refreshed his memory. So saying I don't remember what was in that box is different from contradicting what was actually in that box. And how about what I asked you about, which was about the bid platform information? I'm not... The supposed misrepresentations where the deposition questions, as I say, were pretty broad. Yes, Your Honor, on that point... to talk about that if they remembered it. That's correct, Your Honor, but on that point, I don't think that was material to the case. I believe you're referring to the representation that Norvax made prior to entering into the APA. So are you saying we shouldn't worry about the bid platform stuff? Not on that issue, Your Honor. On any issue? No. The bid platform is relevant to, once again, that Norvax Inc. controlled the entire LeadBot operations. LeadBot couldn't make a sale... Of course they had control. They were the parent company. Right. So it is relevant on that issue. The second subpart of issue number one is whether or not the District Court properly determined at the summary judgment stage that Norvax had acted in good faith under the terms of the APA. Again, this holding is contrary to the Seventh Circuit's decision in Berea v. Baxter Healthcare. There, the Seventh Circuit clearly stated that questions of good faith are intense questions of fact that should be reserved for a jury. In this case, Article III of the Asset Purchase Agreement required Norvax to use the assets in furtherance of the LeadBot brand. And admittedly, there was evidence on both sides, as the Court recognized in footnote 12 on page 25. There was evidence that Norvax used one of the 18 domain names that they acquired under the APA to develop, to generate new life insurance leads. However, there's also evidence, that same evidence, that they didn't use 17 of the 18, and that the one that they used, they only developed that new website after a year after they had acquired the other LeadBot assets. Did your clients negotiate in the Asset Purchase Agreement for any standards of performance? No, they didn't, Your Honor. The only standard of performance is the one implied by the duty of good faith and fair dealing that gives color to the obligation in Article III of the APA. But the agreement, that same paragraph, also gives the defendants the option to walk away. Which they chose not to, Your Honor, yes. So the evidence showed that they used one website over a year after the acquisition. The evidence also showed that they took advantage of some, but not all, of the more than 6,000 open orders for the purchase of life insurance leads. Can you, I just wanted, I thought you were going to get to the damages spreadsheet. I'm assuming you're going to get there, but I wanted to know why that wasn't produced during discovery. And if you'd talk about that. Sure. Quite simply, it wasn't requested. Throughout the discovery process, we had a practice with opposing counsel that during a deposition, if there was a document that was referenced that you wanted a copy of that hadn't been produced, you'd ask for it in writing. And it's abundantly clear from the deposition transcript that counsel for the defendants told me, I want a copy of that narrative, and I'm going to give you a letter after this deposition is over that lists each of the documents that I want from you. That letter never came. And I viewed the spreadsheet narrative as more of a demonstrative exhibit that could be produced later at trial. However, on the motion to strike, the defendants implied very heavily that they had requested the damages narrative and that we had refused to produce it. That was an error. And I believe that the district court may have been misled on that point because we, again, weren't allowed to respond. Why isn't, why wasn't that information subject to initial disclosure requirements under Rule 26A? The initial disclosure that we made was the damages calculation itself. Well, the rule also requires the documents rather evidentiary material and less privileged on which each computation is based, et cetera. Right, and the... Particularly when your guy doesn't, can't answer the questions during deposition. Right, well, the evidence on which those calculations were based was already in the record. And that evidence is, we've got the supply agreements with New York Life, Prudential, Strategy Bay. Those contracts put forth the purchase price for the lead, for the leads that are going to be purchased. And also, in some cases, the volume that's going to be purchased. So that was already in the record. Already in the record were the P&L statements that put forth the cost of goods sold and the traditional and customary overhead. So the, you know, this is a, once again, a simple breach of contract case. And the calculation of damages is pretty straightforward. You take the price at which the leads would have been sold. You subtract the cost of goods and overhead. And there you've got the profit. And the, all the evidence to make those calculations was already in the record, regardless of the exhibits. Yeah, but you're supposed to do the calculations and lay them out for the defense, right? Right, and we did. And that's what was reflected in the damages calculation that was produced. One of the issues here, Mr. Jones, has to do with the fact that, did your clients have any record of making profits before this acquisition? Your Honor, that's actually, yes, they have been in business for 12 years. Had they been, that's not my question. Right. No, that fact was not in evidence. Had they been making any profits? Yes. Yes, and they made profits after the acquisition, too. That's where the earn out came from. Well, yes, of course. But, well, I thought we had a new business that was essentially on the brink of bankruptcy when your bank pulled the credit line. That's what the district court held, Your Honor. But the facts, especially when viewed in a light most favorable to northbound, clearly indicate that this wasn't a new business. This was an ongoing business that had been in operation for 12 years. For 12 years prior to the acquisition, northbound was in the business of generating and selling life insurance leads. And let's say in the two years prior to the acquisition, what did the P&L statements for your clients show? I don't know, Your Honor. That wasn't, it's not part of the evidence. All right. Thank you, Mr. Jones. Okay. Thank you. Your time has expired, but I'll give you a couple minutes at the end. Okay. For rebuttal. Okay. Mr. Kendrick. Good morning, Your Honors. May it please the Court. Chris Kentra on behalf of the defendants in the appellees here. Your Honor, throughout this proceeding, northbound has used the terms, the name Norvax and Leadbot interchangeably. They used the term interchangeably in their amended complaint. They used the names of these companies interchangeably in the deposition questions they asked of my client's witnesses. And they've used, their clients have used the names interchangeably in their deposition testimony. I think before I respond to the different arguments that plaintiff has in support of its breach of contract count, I'd like to just review a few key points about the respective parties in the case and about some of the key provisions of the asset purchase agreement that governs the dispute here. Northbound is a company that's owned by two individuals, Rob McLear and Ben Wagner. In 2009, northbound was insolvent. Its line of credit had been frozen. It had no access to other capital. It had no other potential purchasers of its assets. Leadbot LLC purchased northbound's assets in February of 2009. Leadbot LLC is a Delaware limited liability company. Norvex is the member and manager of Leadbot LLC. Importantly, Norvex is not a party to the APA. Under the asset purchase agreement in this case, assets were defined as all property, rights, and other assets of northbound's business. The APA required only that Leadbot LLC use those assets in furtherance of the Leadbot brand. There were no specific obligations with respect to operations that were placed on Leadbot in the APA. In fact, as this court recognized, Leadbot had the discretion to terminate the APA upon its discretion upon 90 days notice to northbound. It's also important to note what is not in the APA. Despite what plaintiff can suggest and assert in this case, there is no provision in the APA that requires Norvex to provide a minimum level of life insurance leads to Leadbot. There's also no provision in the APA that prohibits either Leadbot or Norvex from regulating the amount of health insurance leads that northbound could sell to Norvex's pre-existing health insurance customers. There's also no provision in the APA that provides for minimum earn out to northbound. In that context, the district court properly ruled that with respect to northbound's breach of contract claims against Norvex, that because Norvex is not a party to the APA, it cannot be held directly responsible for any alleged contractual liabilities of Leadbot. It did so on a rather simplistic basis. Leadbot is a Delaware LLC. Under the laws of Delaware, the members and managers of an LLC can't be held personally responsible for the debts and obligations of the company. This ruling was absolutely correct. What northbound has attempted to do is raise several different arguments to establish direct contractual liability of Norvex in this case. And the district court addressed all those issues and properly rejected them. First, the district court properly rejected the argument on behalf of northbound that Norvex was in privity of contract with Leadbot for purposes of the APA. On appeal, it appears that northbound is attempting to rely upon this court's decision in Kaplan v. Shure, although that decision absolutely is opposite to the proposition that northbound is making here. In that case, the plaintiff tried to assert a breach of contract claim, claiming that he was in privity with his former corporation, such that he could pursue a claim on a real estate contract that the corporation had with the defendants. This court specifically rejected that theory and noted that there was nothing in the record that demonstrated that, in fact, that right had been assigned to the plaintiff by his former corporation. In that opinion, the court identified privity of contract and defined it to mean the mutual or successive relationship to the same rights of property. The relationship may arise by operation of law or by involuntary or voluntary transfer. In this case, northbound has not presented any evidence to demonstrate that there's been a transfer of any rights under the APA between Leadbot LLC and Norvex. In fact, it never occurred. There is no evidence to that effect. The district court was absolutely appropriate in granting summary judgment on the issue of whether or not Norvex was in privity of contract with Leadbot. Northbound also relies on the Kaplan decision to support its argument that, somehow, because the district court did not dismiss Northbound's breach of contract claim at the beginning of this case, it was therefore somehow precluded from granting summary judgment on this issue of privity of contract. That exact same argument was made by the plaintiff in the Kaplan case, and it was rejected by this court. This court ruled that and recognized that motions to dismiss under 12B6 are governed by a different standard than motions for summary judgment under Rule 56. It rejected the exact same argument that's being put forth by Northbound here, and this argument should be rejected in this case. Northbound also made the argument in its brief that Norvex could be held directly responsible under the APA under what's termed the direct participant doctrine. And it cites Phillips v. Wellpoint in support of that contention. However, the Phillips v. Wellpoint opinion is opposite to the proposition that Northbound is contending. In the Phillips decision, the court considered the argument of whether or not the direct participant liability doctrine could be used to extend contractual liability to a parent corporation, and specifically rejected that contention. The court recognized that the doctrine was only recognized in the context of tort claims, and it specifically refused to extend it to contract claims. So it's our position that although Northbound relies on Phillips v. Wellpoint, it contradicts rather than supports their position. There were also arguments made in Northbound's appellate brief that, for the first time on appeal, that Norvex and Libot are alter egos of each other and therefore, under that basis, Norvex can be held directly liable under the APA. As an initial matter, this argument was not raised below in the cross motions for summary judgment before the district court, and I believe it's waived by rule. Additionally, as this court has already noted, there is no piercing the corporate veil claim that was pled by Northbound in this case. Therefore, it's waived on that basis as well. Even if the argument's entitled to any consideration in order to pierce the corporate veil... Would piercing the corporate veil have to be pled? My understanding is you don't have to plead theories, you don't have to plead particular facts except in certain circumstances. Couldn't they rely on that even though it hadn't been pled? I don't believe so, Your Honor. I believe it absolutely has to be pled. What cases indicate that you have to plead, that you're going to seek recovery under a piercing the corporate veil theory? I believe the Wellpoint opinion at page 9 addresses that issue. The Wellpoint opinion? I believe so. Is that Judge Gilbert? Not certain, Your Honor, but... This court has said scores, if not hundreds of times, that complaints do not need to plead legal theories. Now, summary judgment's an entirely different story. Your Honor, understood. But in the context of this case, when you evaluate the merits of the theory, if you just evaluate what has to be established in order to pierce the corporate veil, the facts simply aren't here in any event, in any regard. Okay. Don't try to worry about the pleadings is what I'm trying to tell you. I understand. You got past that stage, you lost your motion to dismiss, but you won on summary judgment. Focus on summary judgment and don't tell us that it's necessary to plead the theory, okay? Yes, sir. In any event, there aren't sufficient facts to demonstrate any reason to pierce the corporate veil here. They weren't generated in the course of this case. The type of information that's necessary in order to be allowed to obtain that type of relief simply hasn't been generated in this record. Northbound also makes arguments that both Norvex and Libot violated their duty of good faith and fair dealing under the APA. And their principal argument is that the defendants failed to sufficiently use the assets that they obtained through the asset purchase agreement in furtherance of the Libot brand. The duty of good faith and fair dealing, as this court well knows, only requires that contractual discretion be exercised reasonably. In this context, Northbound claims that the defendants failed to adequately use customer contracts that were in existence and transferred by virtue of the APA. They've alleged and claimed that certain lease supply agreements that were transferred as part of the APA were not sufficiently used. And they've also claimed that certain websites and domains weren't sufficiently used. In the first instance, with respect to Norvex, the District Court properly ruled that because it is not a party to the APA, it has no duty of good faith and fair dealing. And on this basis, the claims against Norvex fail and the District Court properly recognized that fact. With respect to Libot, in order to sustain its claims, Northbound would have to come forward with some type of evidence to demonstrate that, in fact, Libot used the Northbound assets in an unreasonable manner. But it did so in a way to interfere with its contractual rights. It's our contention there's absolutely no information or evidence at all in the record to support that. And we cite to the depositions of Mr. Clint Jones, who's the CEO of Norvex and Libot, and Mr. Michael Mahoney, who's the Chief Information Officer for Norvex. Both of those individuals were deposed in this case and specifically asked about these issues. Both of the individuals testified that Libot tried to use Northbound's existing customer contracts, but they were poorly negotiated and commercially unreasonable. The company couldn't make money under those contracts. They also tried to use the lead supply contracts that they purchased by virtue of the APA and found that the suppliers were poor performers. And that, again, the agreements weren't commercially reasonable for the company. They also testified that they tried to use the websites and the domains that they obtained, but the technology was poor and that they couldn't be used effectively for the company. You know, we would submit that there are no disputed issues of fact of whether or not Libot fulfilled its duty of good faith and fair dealing. There is no controverted evidence to suggest that the information that was provided by these witnesses is anything other than completely accurate. Mr. Kattrick, how does this business work? Where do these leads come from? How do you sell them? Generally speaking, the model is that the companies run a series of websites. If an individual were to get on a website and fill out the required number of fields, personal information about themselves and their interest in developing or obtaining either life insurance or health insurance, then that information in and of itself becomes what is known as a lead. And it's a sellable item then, either to an insurance company that wants to make a sale with respect to an insurance policy or potentially with a broker that may want to sell insurance. Okay, thanks. So in this context, Judge, there's also another thing. There's an admission on record in this case by the defendants, by the two owners of Northbound, which demonstrate as a matter of law that Leadbot acted in good faith and fair dealings with respect to this transaction. There was an email chat that was produced in this case between Mr. McAleer and Mr. Wagner. It's docket number 131. In that document, the owners of Northbound expressly admit that both Leadbot and Norvax did everything in its power to try to make the Leadbot business work. They admit that the reason why the business didn't work was because of economic conditions and poor contracts that they entered into on behalf of the company. It's an essential document to evaluate this allegation that Leadbot violated its covenant of good faith and fair dealing, and it provides an independent basis alone to deny or grant summary judgment on that claim. Did the APA indicate or require that Norvax employ the plaintiffs? No. How did it come about that they became employed by Norvax? They initially entered into independent contractor agreements with respect to Norvax to supply leads. Later, those were changed into independent employment agreements, and they were given management positions. It's not accurate to say, though, that Leadbot did not have bank accounts, that Leadbot did not have assets, and that Leadbot did not have employees. That's wrong. It did have all those things. It also had an independent office in Arizona where it ran its operations. Ultimately, the plaintiffs entered a termination of their employment agreement with Norvax. Is that correct? That is correct. And that's not part of the suit? Excuse me? That's not part of the suit? No, it's not. Wagner and McAleer aren't parties, are they? No, they're not part of the suit. Your Honor, I'd like to turn to the district court's decision to grant defendants' motion to strike Mr. McAleer's post-deposition affidavit and the supporting exhibits, which were projections of lost profits that had never been produced in discovery. The district court acted completely within its discretion in this regard because the affidavit testimony was inconsistent with Mr. McAleer's prior decision. How can a district court have discretion to grant a motion while prohibiting the opposing party from responding to it? Judge, I think briefs to courts are filed or entertained at the discretion of the court. I think in this context. I'm talking about due process. I don't believe there's a due process issue here, and I don't believe that. Opportunity to be heard? There was opportunity to be heard. Their witness was deposed. They had an opportunity to respond to the motion. Not to the motion. The court prohibited that. Yes, the court had received that. How can we tolerate that? I believe, Your Honor, that the court got the issues absolutely right. I don't believe. Harmless is different from an erroneous procedure. But this is a situation where we see, and district judges see all the time, conflicts between or argued conflicts between deposition testimony and affidavits, and it all depends on the details and whether there's an explanation. In this case, you all were asking very broad and open-ended questions. Most of our memories don't do as well until we're prompted with specific questions. There are explanations that can be given. Here, all that's cut off by the district court's instruction, don't respond to this. Judge, I would point to Northbound's argument here on appeal and what it suggests that it would have said to the district court and whether or not that would have been beneficial or changed the determination at all. Apparently, all it would have said was counsel promised that he would write me a letter and specifically ask for something and didn't do it. I spent this entire case trying to get documents. Two different issues. One's the damages, one is the bid platform, which apparently plaintiff doesn't have much interest in anymore. Bid platform is easier to understand, but why didn't you follow up with the letter? Judge, I asked him the deposition. I'm sure that I followed up orally. I didn't send a letter. I didn't do it. I believe there's an affirmative obligation from the plaintiff to submit all the evidence that it intends to use to support its damaged claims under rule 26. That's the kind of thing we expect district judges and magistrate judges to sort out fairly and after hearing from both sides. Yes, sir. I believe that the district court had the information that it needed in order to rule on the motion to strike. In any event, with respect to the issue of the North Bond, also contends that the district court erred that whether or not or if it had received Mr. Maclear's affidavit and supporting lost profit projections or calculations, that in any event that information would have been admissible. The court properly ruled that under the new business rule in Illinois that the projections that were being submitted by North Bond here were conjecture and lacked reliability. In this context, North Bond argues that, in fact, because North Bond was in existence before the APA and had operations before the APA, that it wasn't a new venture. But it's uncontradicted in the record that a significant aspect of this dispute involves North Bond, their efforts to sell health insurance leads on behalf of LEADBOT, something that they never did. They never did when they were part of North Bond. They attempted to sell health insurance leads, Mr. Wagner and Mr. Maclear, while they were employees of LEADBOT. They were regulated in that regard by Norvax. In this context, if you look at the proposed projections that are the exhibits to Mr. Maclear's affidavit, they incorporate over $9.75 million of projected health insurance lead sales, admittedly something that North Bond never did in the past. In that regard, the district court was absolutely appropriate in ruling that, in fact, this was a new business venture and evidence of lost profits were admissible. Separately, there's some arguments that were made by North Bond in its brief, not real clearly, that perhaps it could rely on its past conduct in order to establish lost profits. I think in the questioning that happened with my opponent, none of that information is in the record. In fact, we'd argue there were no profits and there was no course of performance that could support those type of damages. There's also an argument that's been made here by North Bond that because certain agreements that were used by Mr. Maclear in order to generate his projections were just generally produced in the record that it should be allowed to go forward and try to assert a damage claim in this case. However, the district court properly ruled that it did not have to piece together information that was produced by the parties in the record in order to try to sustain North Bond's damage claim. The district court's opinion says it is not this court's responsibility to research and construct the parties' arguments. In this context, the district court was absolutely on point. Secondarily, the information that North Bond talks about are the same contracts that provide the basis for Mr. Maclear's speculative lost profit projections. So in any event, it's barred by the Illinois New Business Rule in any circumstances. Finally, there was an argument that was made by North Bond that it should be relieved from a stipulation that it made with respect to the amount of withheld earn-out that it was awarded on summary judgment in the court below. In this regard, it's our position that the district court ruled completely appropriately. It ruled in favor of North Bond on the withheld earn-out, but it independently identified that the documentation that North Bond relied upon on its face was ambiguous in terms of what the amount of the earn-out would be. The court offered to conduct an evidentiary hearing on the issues and invited the parties to stipulate. The parties did stipulate on that amount, and it's our contention that North Bond is bound by that stipulation even on appeal. Thank you, Mr. Kintry. Thank you. Two minutes, Mr. Jones. Apelli began his argument with the assertion that there never was a transfer of rights or obligations under the APA from LeadBot LLC to Norvax, Inc. Then Apelli proceeded to tell us the rights that Norvax could exercise under the APA, including the right to limit sales of health insurance leads, the right to limit leads or provide none at all, and the right to terminate the APA on 90 days' notice. Both Mr. Jones and the CFO of the company both testified consistently during their depositions that LeadBot was not operated as a separate entity, that it was operated as a brand under the Norvax, Inc. umbrella. I saw the language operated as a brand. I didn't hear the operated, not operated as a separate entity. I believe one excludes the other, Your Honor. Really? Yes. That a brand is necessarily whatever operating unit operates a brand as part of the parent company, without any legal distinction? Not that I know of, Your Honor. I'm not sure. That would be extraordinary. Could you address the stipulation point? Why on earth aren't you bound by that? Your Honor, the only reason that the plaintiff entered into the stipulation at that point was because the district court judge was going to allow the defendants to introduce new evidence in support of its argument that it never supported at the summary judgment stage that the amount of the earn-out, the amount of the earn-out damages should somehow be reduced. They never supported that. That would be a good argument for appeal. If you had a hearing and you disagreed with the result, what was the point of the stipulation? The point of the stipulation was just the plaintiff had no opportunity to examine the defendants with respect to the amount of the earn-out because the P&L statements were only produced three months after the close of discovery. And so that would be a good argument if you went ahead and had a contested hearing on it and the judgment was entered in the amount of $45,000 instead of the $56,000 you want. The fact that you stipulated seems to give it all away. Well, it wasn't a willful stipulation is what I'm getting at, Your Honor. So how does the district judge know that? You say we're stipulating but reserving the right to appeal? No. I had objected to the concept or the order that the judge was going to allow new evidence in when it had obviously And so what do you think the stipulation resolved? It avoided the need for a trial on the damages where the defendants were going to put somebody on the stand who had never had an opportunity to present. Avoided the need for a trial, right. And what you want is a trial on that issue, right? No, Your Honor. That's what you're asking for on this. No, what I'd want is summary judgment. The district judge denied it and said the evidence wasn't clear enough. It wasn't even legible. No, I disagree, Your Honor. It was hard to read but it was legible. And he also held that the defendants had put forth no evidence in support of their claim. Therefore, that's the only evidence this court would have to rule on is the evidence in favor of the amount of earnout that was withheld, which is the larger amount, not the smaller amount. All right. Thank you, Mr. Jones. Thank you. We'll take the case under advisement.